U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2016 FEB 11  PM 4: 21

CLERK

BY_____
DEPUTY CLERK

ALAIN PASCAL BERNARD GALLEY )
SCHULER and JEAN CHRISTIAN )
PHILIPPE GALLEY SCHULER, )
)
        Plaintiffs, )        Docket No.: 2:14-cv-226
)
v. )
)
RAINFOREST ALLIANCE, INC., )
)
        Defendant. )

## OPINION AND ORDER GRANTING DEFENDANT'S RULE 12(c) MOTION FOR JUDGMENT ON THE PLEADINGS WITH RESPECT TO PLAINTIFFS' FIRST AMENDED COMPLAINT

(Doc. 34)

Pending before the court is a motion for judgment on the pleadings filed by Defendant Rainforest Alliance, Inc. ("RA"). RA seeks judgment as a matter of law in its favor on all claims set forth in the First Amended Complaint filed by Plaintiffs Alain Pascal Bernard Galley Schuler and Jean Christian Philippe Galley Schuler (the "Galleys"). The grounds for RA's motion are twofold. First, RA requests that the court decline jurisdiction pursuant to the doctrine of international comity. Second, RA asks that the Galleys' negligence, defamation, and slander of title claims be dismissed for failure to state a claim.

The Galleys oppose the motion, arguing that international comity should not bar this court's jurisdiction and asserting that they have alleged plausible claims for relief. In adjudicating the pending motion, the Galleys have requested the court to take judicial notice of thirteen exhibits which supplement or provide context for the factual allegations set forth in their First Amended Complaint. Pursuant to an Entry Order Granting in Part and Denying in Part Plaintiffs' Request for Judicial Notice dated February 10, 2016 (Doc. 66), the court took judicial notice of certain facts which are incorporated herein.

The court heard oral argument on RA's motion on October 13, 2015. Thereafter, the court permitted supplemental briefing on the issues of whether this court is authorized to determine title to real estate located in Mexico, whether all or some of the Galleys' claims must be adjudicated in accordance with Mexican law, and whether this court should take judicial notice of certain information submitted by the Galleys. This supplemental briefing was completed on January 27, 2016.

RA is represented by Robert S. DiPalma, Esq. The Galleys are represented by Ann L. Al-Bahish, Esq. and Thomas P. Aicher, Esq.

I.      The First Amended Complaint and RA's Answer.

        A.      The Parties.

The Galleys[1] are foreign nationals who, since 1992, have owned five contiguous parcels, consisting of approximately 8,076 acres/3,268.41 hectares, in Campeche, Mexico (the "Galley Property"). They allege that they "purchased this land for commercial reasons and to gain economic benefit from the land" and that the deeds for the Galley Property "are properly filed in the Public Registry of Property and Commerce in Campeche, Mexico." (Doc. 22 at 4, ¶ 17.)

RA is a global nonprofit corporation which is registered to do business in Vermont and which has its "Forestry Headquarters" in Richmond, Vermont. RA is accredited to perform Forest Stewardship Council ("FSC") sustainability and certification analyses and is in the business of providing landowners with independent certification services for forestry operations and products. The Galleys allege that RA "is the leading certifier for the FSC Forest Management Certification." *Id.* at ¶ 16. The Galleys further assert that, at all relevant times, RA transacted business within the State of Vermont and published the alleged defamatory statements here.

In addition to their claims against RA, the Galleys originally alleged claims against Defendant Forest Stewardship Council-US, which is the trade name for a nonprofit organization that does business in Vermont, and against Defendant U.S.

---

[1] Through an assignment of her interest, the Galleys pursue claims on behalf of Anne Joelle Viguier-Galley as well.

2

Working Group, Inc., which is a nonprofit organization that owns the Forest Stewardship Council-US. The Galleys refer to these Defendants collectively as "FSC" and allege that FSC "is a national office of the internationally headquartered Forest Stewardship Council, A.C., which sets global standards for forest management and promotes the marketing of certified products and products that come from certified forests." *Id.* at 2, ¶ 6. The Galleys allege that "FSC, together with related entities, directs and supervises certifiers' application of the FSC standards" and "promotes entities that have received FSC certifications and/or the right to use the FSC logo." *Id.* at 3, ¶ 14. The Galleys have voluntarily dismissed FSC without prejudice.

### B. The Mexican Land Dispute.

On or about April 13, 2003, non-party Agropecuaria Santa Genoveva, S.A.P.I. de C.V. ("AGSA"), which owns property adjacent to the Galley Property, allegedly entered the Galley Property without notice or permission and took possession and control of over 1,547.11 hectares (approximately 3,823 acres) (the "Disputed Parcel"). In response, on April 16, 2003, the Galleys filed two lawsuits in Mexico; one against AGSA and the other against Consorcio Agroindustrial Guepell, S.A. de C.V. ("CAG") to recover possession of the Disputed Parcel. The two lawsuits were consolidated into a single action (the "Trespass Action").

On January 15, 2010, the Mexican trial court issued a decision in the Trespass Action (the "2010 Order").[2] The 2010 Order concludes that the Galleys failed to prove that CAG was in possession of the Disputed Parcel and that "the suit for recovery of possession [by the Galleys] is declared inadmissible" and that "therefore, [CAG] is acquitted of all compensation claimed by the plaintiff." (Doc. 36-17 at 14.)

With regard to AGSA, the 2010 Order provides in relevant part:

> . . . we proceed to the study of the main action in this proceeding, taking into consideration that the suit for recovery of possession is incumbent on

---

[2] Both RA and the Galleys have submitted translations of the 2010 Order which vary in non-material ways. For ease of reference and for purposes of adjudicating the pending motion, the court has taken judicial notice of the Galleys' certified translation of the 2010 Order. (Doc. 36-17.)

[the party] who does not have possession of the thing owned . . . [to] prove: a). - Ownership of the property in this suit; b). - Possession by the respondent of the property pursued, and c). - Its identity, that is, there can be no doubt as to the thing it is intended to recover and to which lawsuit supporting documents make reference to, specifying location, area and boundaries, facts demonstrated by any of the evidence acknowledged by law.  Once the elements in the suit for recovery of possession have been identified, we will analyze each of them to determine whether the plaintiff properly credited said elements.  Regarding the FIRST ELEMENT (ownership of that which is claimed), **[the Galleys] . . . are the owners of the properties stated in their corresponding deeds**. . . . However, although with the aforementioned title deeds, the plaintiff certified as to owning the property mentioned in said deeds, for the suit for recovery of possession at issue, we should indicate that the respondent presented, as a defense, the categorical denial of the alleged invasion of measurements of which plaintiff complains, arguing completely opposite facts, as he states as important argument, that there are flaws in the original title deeds covering the areas of land claimed by the plaintiff, by virtue of which the plaintiff omits the exact location of their properties, and that . . . there is a topographical surveying . . . producing a surplus of 1,601-77-00 hectares, in favor of [CAG] no document determines where the surplus is located, so the question arises as to the property it is intended to recover possession of in the suit, and also as to the authenticity of the lawsuit supporting documents.  **As a preface, it should be noted that, as can be seen, there are a number of contradictions between what is intended by the plaintiff, based on his respective property titles, and what is opposed by the respondent; and that given the magnitude of the area in litigation, and the visible differences with respect to the exact location to date of the land that was split up, its boundaries, adjacencies, directions, among others, [more evidence is needed.]**

* * *

[In light of the dispute, the parties offered expert evidence which is described.]  In accordance with said expert opinions it is appraised that **it was not possible to locate the areas that are covered by the property titles exhibited by the plaintiff,** due to the incongruity that, given the directions the title deeds reveal, margins of error were found to exist outside the angular and linear tolerance, errors affecting their areas, perimeters and, hence, their geometric shape, **except for property Tucán 1.**

* * *

[I]n this case, we have [the] property titles displayed by the plaintiff, in their capacity of foundational property titles for the action for recovery of

4

possession, **do not correspond to the area of land he claims the respondent has in his possession.**

\* \* \*

In turn, regarding the property Tucán 1, . . . [i]t can be seen . . . **that in no way was the material occupation that is claimed against the neighboring property shown**[.] . . . Under these circumstances, we have that in the specific case of **Tucán 1, the alleged possession by the company named [AGSA] was not proven, as the second constituent element of the suit for recovery of possession**; it is therefore meaningless, to initiate the study of these elements, with regard to the rest of the properties claimed by the plaintiff[.]

\* \* \*

**For the reasons and legal considerations set forth, and by failing to demonstrate the elements of the suit for recovery of possession, the claim for recovery of possession is dismissed, the suit brought on by [the Galleys] against [AGSA and others], and, therefore the respondent is hereby absolved of all compensation claimed by the plaintiff.**

*Id.* at 18-24 (emphasis supplied).

The Galleys allege that the 2010 Order "proved that they were the owners of the property stated in their deeds," (Doc. 22 at 5, ¶ 23), but acknowledge that the Mexican trial court found that the Galleys "had not met their burden to prove all of the elements of the Trespass Action." *Id.* at 6, ¶ 24. The Galleys appealed the 2010 Order, which was affirmed by a Mexican appellate court. They point out that although the Mexican courts did not find they had title to the Disputed Parcel, those courts also did not affirmatively find that AGSA owned it.

The Galleys allege that AGSA submitted to RA a "2011 Mexico Court Order titled 'Amparo directo 48/2011 en materia civil'" (the "2011 Order") regarding the Disputed Parcel, and that the "2011 Order likewise did not hold that AGSA is the legal owner of the [Disputed Parcel]" and that AGSA "wrongfully claimed that the Order proved that it owned the [Disputed Parcel], and [RA] accepted that claim without performing any due diligence to verify its veracity." *Id.* at 5-6, ¶¶ 23-24.

5

## C.    RA's Certification of the Disputed Parcel.

In 2006, AGSA initiated the process of obtaining FSC Forest Management Certification ("FSC certification") from RA.  On or about November 6, 2006, Plaintiff Alain Pascal Bernard Galley Schuler notified RA and Forest Stewardship Council, A.C. that he opposed FSC certification because AGSA's request for certification included the Disputed Parcel and because AGSA's forestry operations did not comply with FSC principles.  Notwithstanding his objection, on or about August 28, 2009, RA issued its first FSC Forest Management Certificate to AGSA for property AGSA purportedly owned in Campeche, Mexico.  This Certificate did not include the Disputed Parcel and was valid for five years with annual audits.  The Galleys do not identify any false or defamatory statements in this initial FSC certification, which is available on FSC's website.

FSC Principles and Criteria for Forest Stewardship ("FSC Principles") provide that "[t]he goal of FSC is to promote environmentally responsible, socially beneficial and economically viable management of the world's forests, by establishing a worldwide standard of recognized and respected Principles of Forest Stewardship." (Doc. 36-14 at 4.) "FSC and FSC-accredited certification organizations will not insist on perfection in satisfying [FSC Principles].  However, major failures in any individual Principles will normally disqualify a candidate from certification, or will lead to decertification." *Id.* FSC Principles leave this determination to "individual certifiers[.]" *Id.* FSC Principles further provide:

> Appropriate mechanisms shall be employed to resolve disputes over tenure[3] claims and use rights.[4]  The circumstances and status of any outstanding disputes will be explicitly considered in the certification evaluation.

---

[3] "Tenure" is defined as: "Socially defined agreements held by individuals or groups, recognized by legal statutes or customary practice, regarding the 'bundle of rights and duties' of ownership, holding, access and/or usage of a particular land unit or the associated resources there within (such as individual trees, plant species, water, minerals, etc[.])." (Doc. 36-14 at 14.)

[4] "Use Rights" are defined as: "Rights for the use of forest resources that can be defined by local custom, mutual agreements, or prescribed by other entities holding access rights.  These rights may restrict the use of particular resources to specific levels of consumption or particular harvesting techniques." *Id.*

6

> Disputes of substantial magnitude involving a significant number of
> interests will normally disqualify an operation from being certified.

*Id.* at 6.

In 2010 and 2011, RA conducted subsequent audits related to AGSA's FSC
Certification. The Galleys allege no false or defamatory statements in either of these
audits. In its 2012 audit, however, RA expanded the scope of AGSA's FSC Certification
to include the Disputed Parcel (the "2012 Audit").[5] The 2012 Audit states in relevant
part:

> The certified area increased from 10,035.81 hectares to 11,584.90 hectares
> because AGSA proved possession of 1,547.11 hectares that were in dispute
> with its neighbors and which AGSA lawfully owns. The change in the
> certified area is due to the inclusion of planted areas plus roads.
>
> * * *
>
> **Evidence provided by the Organization:** Lower-court decision declaring
> the LEGAL ACTIONS CLAIMING OWNERSHIP filed by Mr. Galley
> INADMISSIBLE. Observation of the work in question in the field.
>
> **Findings from evaluation of evidence:** [AGSA] has performed
> maintenance on and cleaned the roads located inside the area (1,547.11
> hectares), thus demonstrating possession of the land that was in dispute.
> These roads connect lots 11, 12 and 21 and are now serviceable. It was
> also observed that cedar trees were planted alongside the road and they are
> now part of conservation areas, meaning that enrichment planting work has
> been done.

(Doc. 34-3 at 2-3.) The Galleys allege that RA's 2012 Audit "was electronically
uploaded to the certificate database" and that "FSC's summary and endorsement of the
report is available on the FSC website." (Doc. 22 at 7, ¶ 28.)

The Galleys claim that FSC's publication and endorsement of RA's 2012 Audit
harmed them because AGSA does not own the Disputed Parcel and because FSC
Certification "has interfered, and continues to interfere, with the Galleys' business and
economic interests related to the Galley Property." *Id.* at 8, ¶ 32. The Galleys also

---

[5] In their briefing, the Galleys assert that RA certified land beyond any land addressed in the
Mexican litigation. This claim is not considered as it is outside the scope of the Galleys' First
Amended Complaint, which alleges only that "[RA] extended the scope of the AGSA
Certification to include the [Disputed Parcel]." (Doc. 22 at 6, ¶ 25.)

appear to assert claims based on RA's and FSC's decision to allegedly wrongfully permit AGSA to display the "FSC" and "Rainforest" logos on its products and promotional materials, thereby misleading consumers. They allege that AGSA's destruction of archeological sites and clear cutting of indigenous rainforests is contrary to FSC Principles.

In their First Amended Complaint, the Galleys assert negligence, defamation, and slander of title claims and seek compensatory and punitive damages, as well as a declaratory judgment[6] that:

(1) the opinion in the Mexico court in the Trespass Action does not indicate or establish that AGSA owns title to the properties in question or the timber thereon; (2) that the FSC certifications awarded to AGSA on the [Disputed Parcel] are invalid and should be publicly revoked; (3) that [RA] failed to follow proper certification guidelines in issuing the certifications of the entire geographic area to AGSA; (4) that the certification awarded to AGSA on its other lands is invalid and should be publicly revoked; (5) that the Galleys own title to the [Disputed Parcel] in question and the timber thereon; and ([6]) that the Galleys are entitled to seek certification for any timber located on the [Disputed Parcel].

*Id.* at 10-11, ¶ 43.

In its Answer, RA admitted that it added 1,547.11 hectares of land to AGSA's FSC certification, but denied that the land was "invaded property[.]" (Doc. 31 at 4, ¶ 25.) RA further denied that it was negligent in issuing FSC certification to AGSA or that the statements made in its 2012 Audit were false, defamatory, or slandered the Galleys' title

---

[6] The Galleys' request for a declaratory judgment relies upon the Vermont Declaratory Judgment Act, 12 V.S.A. § 4711. However, "[t]he propriety of granting declaratory relief in federal court is a procedural matter." *DeFeo v. Procter & Gamble Co.*, 831 F. Supp. 776, 779 (N.D. Cal. 1993). "Therefore, the [federal] Declaratory Judgment Act is implicated even in diversity cases, whether an action is originally filed in federal court or is properly removed there by defendant." *Id.*; *see also Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 240 (1937) (recognizing "the operation of the Declaratory Judgment Act is procedural only."). "State substantive law addressing [the subject of declaratory judgments] is simply inapposite." *Nat'l R.R. Passenger Corp. v. Consol. Rail Corp.*, 670 F. Supp. 424, 429 n.7 (D.D.C. 1987). A request for a declaratory judgment is not a separate cause of action. *See Nat'l Union Fire Ins. Co. of Pittsburgh v. Karp*, 108 F.3d 17, 21 (2d Cir. 1997) ("The DJA is procedural in nature, and merely offers an *additional remedy* to litigants.") (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995)). Accordingly, the court does not address that requested remedy as a separate claim.

to the Disputed Parcel.  After the Galleys were granted leave to amend their Complaint and did so, RA filed the pending motion for judgment on the pleadings, asking that the Galleys' claims against it be dismissed.

## II.      Conclusions of Law and Analysis.

### A.      Standard of Review.

"In deciding a Rule 12(c) motion, [the court] employ[s] the same standard applicable to dismissals pursuant to Fed. R. Civ. P. 12(b)(6)." *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (internal quotation marks omitted).  The court "accept[s] all factual allegations in the complaint as true and draw[s] all reasonable inferences in [plaintiffs'] favor." *Id.* (internal quotation marks omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* (internal quotation marks omitted).

The court "considers the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (internal quotation marks omitted).  "A complaint is [also] deemed to include any . . . materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Id.* (internal quotation marks omitted).

The district court's role "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) (internal quotation marks omitted); *see also Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) ("The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits.").  "Judgment on the pleadings is

appropriate if, from the pleadings, the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union*, 47 F.3d 14, 16 (2d Cir. 1995).

Although the court has taken judicial notice of certain facts proffered by the Galleys, the Galleys cannot transform the allegations of their First Amended Complaint through the submission of numerous extraneous documents of questionable reliability. *See Keywell L.L.C. v. Pavilion Bldg. Installation Sys., Ltd.*, 861 F. Supp. 2d 120, 127 (W.D.N.Y. 2012) ("Generally, a motion for judgment on the pleadings must be based upon the pleadings, and not on additional evidence submitted by any party"). They also cannot oppose RA's motion by asserting that at some point in the future, they may present additional evidence in support of their claims.[7] The court's analysis is therefore focused on the allegations of the First Amended Complaint and whether they state claims against RA for which relief may be granted. Fed. R. Civ. P. 12(b)(6); 12(c).

Because the court's jurisdiction over this case is based upon diversity of citizenship, it analyzes the Galleys' tort claims in accordance with Vermont law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-79 (1938); *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005).

## B.    Whether RA is Entitled to Judgment in its Favor with Regard to the Galleys' Negligence Claim.

In support of their negligence claim, the Galleys allege that RA, which "claim[s] to adhere to suitable processes and safeguards in [its] decision-making in order to issue

---

[7] The Galleys assert that: "Perhaps most importantly, though, Plaintiffs believe and will submit evidence that Defendant has certified Galley lands that were not even arguably addressed in the proceedings before any court in Mexico." (Doc. 36 at 12.) Their reliance on *Sheppard v. Beerman*, 18 F.3d 147 (2d Cir. 1994) and *Conley v. Gibson*, 355 U.S. 41 (1957) for the proposition that a complaint should not be dismissed on the pleadings unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief is misplaced. That proposition was abrogated by *Bell Atlantic Corp. v. Twombly*. 550 U.S. 544, 562-63 (2007) ("We could go on, but there is no need to pile up further citations to show that *Conley*'s 'no set of facts' language has been questioned, criticized, and explained away long enough . . . and after puzzling the profession for 50 years, this famous observation has earned its retirement. The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.").

and publish impartial and independent forestry certifications, owed legal duties to the Galleys[.]" (Doc. 22 at 9, ¶ 35.)[8] They assert that RA allegedly breached those duties "despite having express and/or implied knowledge of the Galleys' title to the [Disputed Parcel] and the other legal issues surrounding the properties in question." *Id.* They claim that, as a result of RA's alleged breach of duty to them, they "have suffered actual harm and damages as a result of [RA's] actions and have incurred significant expenses in counteracting [RA's] inaccurate, false, and misleading publications." *Id.* at ¶ 36. They argue that because RA participates in the FSC certification process, it "clearly has voluntarily assumed an obligation to assess and address any instance where competing ownership rights are at issue." (Doc. 36 at 20.) RA seeks dismissal of the Galleys' negligence claim, contending that the Galleys have failed to plausibly allege that RA owed a legal duty to them that was breached and caused their injuries.

Under Vermont law, "[c]ommon law negligence has four elements: a legal duty owed by defendant to plaintiff, a breach of that duty, actual injury to the plaintiff, and a causal link between the breach and the injury." *Demag v. Better Power Equip., Inc.*, 2014 VT 78, ¶ 6, 197 Vt. 176, 179, 102 A.3d 1101, 1105 (quoting *Zukatis v. Perry*, 682 A.2d 964, 966 (Vt. 1996)) (internal quotation marks omitted). "The existence of a duty 'is primarily a question of law.'" *Id.* (quoting *Endres v. Endres*, 2008 VT 124, ¶ 11, 185 Vt. 63, 68, 968 A.2d 336, 340); *see also Buxton v. Springfield Lodge No. 679*, 2014 VT 52, ¶ 7, 196 Vt. 486, 490, 99 A.3d 171, 174 (stating that the court determines "whether a duty is owed, as well as the scope of any duty that is owed").

The Vermont Supreme Court has adopted § 324A of the Restatement (Second) of Torts which "delineates when an undertaking to render services to another may result in

---

[8] The Galleys assert that "it is inappropriate to even engage in duty analysis at this stage of the litigation[,]" and that discovery may reveal "duties [RA] has assumed with respect to AGSA[.]" (Doc. 36 at 20.) However, in filing suit against RA, the Galleys are deemed to have asserted only those "claims [that are] warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law[.]" Fed. R. Civ. P. 11(b)(2).

11

liability to a third person." *Derosia v. Liberty Mut. Ins. Co.*, 583 A.2d 881, 883 (Vt. 1990) ("Embracing § 324A formally" as a matter of Vermont law).

> Under § 324A it is not an actor's undertaking alone which subjects him to liability, but rather it is the actor's "failure to exercise reasonable care to protect his undertaking," resulting in either (a) an increased risk of physical harm to the third person, (b) the assumption by the actor of a duty owed by the second person to the third person, or (c) harm to the third person resulting from reliance on the undertaking by the second or third person.

*Id.* at 883-84. The duty arises from a party undertaking "the responsibility of [providing services] in such a manner as to increase the risk of harm or create reliance to another's detriment." *Id.* at 885 (quoting *Thompson v. Bohlken*, 312 N.W.2d 501, 507 (Iowa 1981)).

The Vermont Supreme Court has never recognized a duty under the first prong of § 324A where there is no "increased risk of physical harm[.]" *Id.* at 883.[9] Because this case does not involve physical harm, in order to fall within § 324A's remaining two prongs, the Galleys must either plausibly allege that RA assumed a duty owed to them by a second person or caused harm to them when they relied on RA's participation in the FSC certification process for AGSA to their detriment. Neither circumstance is alleged here.

The Galleys allege no contractual, business, or other relationship between themselves and RA. They also do not allege that they relied on any act or omission of RA to their detriment or that their alleged economic and reputational injuries are "harm to the [Galleys] resulting from reliance[.]" *Derosia*, 583 A.2d at 884. Instead, they cite FSC's Principles and argue that they "clearly required [RA] to take competing land claims seriously." (Doc. 36 at 21.) They, however, make no plausible claim that they are

[9] *See, e.g.*, *Buxton v. Springfield Lodge No. 679*, 2014 VT 52, ¶ 11, 196 Vt. 486, 491-92, 99 A.3d 171, 175-76 (bar room scuffle injuries); *Murphy v. Sentry Ins.*, 2014 VT 25, ¶ 27, 196 Vt. 92, 101-02, 95 A.3d 985, 992 (workplace death); *Kennery v. State*, 2011 VT 121, ¶ 12, 191 Vt. 44, 51-52, 38 A.3d 35, 39-40 (death by hypothermia); *Perry v. Green Mountain Mall*, 2004 VT 69, ¶ 10, 177 Vt. 109, 113, 857 A.2d 793, 796-97 (upper body injuries). *Hempstead v. General Fire Extinguisher Corp.*, 269 F. Supp. 109 (D. Del. 1967) and *FNS Mortgage Service Corp. v. Pacific General Group, Inc.*, 29 Cal. Rptr. 2d 916 (Cal. Ct. App. 1994), on which the Galleys rely, fall within § 324A's first prong as both cases involved plaintiffs who suffered physical harm.

entitled to enforce those standards and recover monetary damages if they are violated. *See Bradford v. BARGE B-10*, 1999 WL 1256248, at \*3 (S.D.N.Y. Dec. 27, 1999) (ruling that in the absence of a contractual or employment relationship, a defendant is "not liable to plaintiff for an alleged breach of OSHA regulations or of [defendant's] own internal safety policies").

To the extent the Galleys claim RA made representations to consumers regarding the nature and quality of FSC products, the Galleys make no plausible claim that these representations create any form of enforceable legal duty owed to *them. See Duffin v. Idaho Crop Improvement Ass'n*, 895 P.2d 1195, 1201 (Idaho 1995) (permitting *purchasers* of certified seed to assert claim against certifying entity that "held itself out as having expertise in the performance of a specialized function . . . [and] knows that seed is sold at a higher price based on the fact that it is certified. Indeed, it has engaged in a marketing campaign . . . the very purpose of which is to induce reliance by *purchasers* on the fact that seed has been certified.") (emphasis supplied). The Galleys neither allege they are FSC product consumers, nor do they assert facts that would confer standing to assert claims on consumers' behalf. *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (considering whether party asserting right to third-party standing can show a "'close' relationship with the person who possesses the right" and "whether there is a 'hindrance' to the possessor's ability to protect his own interests").

The Galleys gain no greater traction by arguing that "by voluntarily agreeing to provide AGSA with a certification, [RA] should have foreseen that the Galleys could have been injured by [RA] failing to comply with appropriate FSC principles and by failing to ensure that AGSA had proper title." (Doc. 36 at 19.) The Vermont Supreme Court has rejected the notion that foreseeability alone is sufficient to create a duty for purposes of a negligence claim. *See Hamill v. Pawtucket Mut. Ins. Co.*, 2005 VT 133, ¶ 6, 179 Vt. 250, 253-54, 892 A.2d 226, 228 ("Generally, whether there is a cognizable legal duty that supports a tort action depends on a variety of public policy considerations and relevant factors, only one of which is foreseeability.") (citing with approval

*Charleston Dry Cleaners & Laundry, Inc. v. Zurich Am. Ins. Co.*, 586 S.E.2d 586, 588 (S.C. 2003) ("Foreseeability of injury, in and of itself, does *not* give rise to a duty.")).

To the extent the Galleys seek recognition of a new duty under Vermont law outside the scope of § 324A, this court must proceed with caution. As the Second Circuit has explained:

> our role as a federal court sitting in diversity is not to adopt innovative theories that may distort established state law. Instead we must carefully predict how the state's highest court would resolve the uncertainties that we have identified. In making this prediction, we give the fullest weight to pronouncements of the state's highest court . . . while giving proper regard to relevant rulings of the state's lower courts.

*Runner v. N.Y. Stock Exch., Inc.*, 568 F.3d 383, 386 (2d Cir. 2009) (quoting *Travelers Ins. Co. v. Carpenter*, 411 F.3d 323, 329 (2d Cir. 2005) (internal quotation marks, citations, and alterations omitted)).

The Vermont Supreme Court has opined that a court "should not recognize a new cause of action or enlarge an existing one without first determining whether there is a compelling public policy reason for the change." *Langle v. Kurkul*, 510 A.2d 1301, 1305-06 (Vt. 1986).[10] The Galleys cite no compelling public policy in Vermont that would give rise to a legal duty extending from an entity that audits FSC certifications to landowners who oppose a third party's certification and who claim that their property and economic interests are adversely affected by it. This is especially true when the certification pertains to the harvesting of wood products in a foreign country. Moreover, far from protecting "the business and economic interests" (Doc. 22 at 8, ¶ 32), which the

---

[10] In addition to foreseeability, the Vermont Supreme Court has considered the following factors in determining whether a duty to third persons exists:

> the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.

*Langle v. Kurkul*, 510 A.2d 1301, 1305 (Vt. 1986) (internal quotation marks omitted) (quoting *Rowland v. Christian*, 443 P.2d 561, 564 (Cal. 1968)).

14

Galleys claimed were harmed as a result of RA's wrongful certification, Vermont's negligence law generally fails to redress purely economic harm. *See Hamill*, 2005 VT 133, ¶ 7 (observing that "negligence law does not generally recognize a duty to exercise reasonable care to avoid economic loss unless the alleged *tortfeasor's* conduct has inflicted some accompanying physical harm") (emphasis supplied).

For the foregoing reasons, this court has little difficulty in predicting that the Vermont Supreme Court would not recognize a legal duty based on the facts and circumstances of this case. *See Carvalho v. Grzankowski*, 622 F. App'x 8, 9 (2d Cir. 2015) (ruling that district court correctly predicted no duty would be recognized under Vermont law). In the absence of a legal duty, a negligence claim cannot be asserted against RA under Vermont law. *See Hamill*, 2005 VT 133, ¶ 12 (affirming "trial court's refusal to find a cognizable legal duty under the circumstances" and concluding that dismissal of plaintiff's negligence claim was appropriate). Because the Galleys have not plausibly alleged that RA owed them a legal duty, an essential element of their negligence claim, RA's motion for judgment on the pleadings with regard to the Galleys' negligence claim is GRANTED and the claim is hereby DISMISSED.

## C.    Whether the Court Should Dismiss the Galleys' Defamation Claim.

In support of their defamation claim, the Galleys allege that RA "inaccurately characterized the resolution of the Trespass Action as stating that AGSA demonstrated ownership of the [Disputed Parcel,]" (Doc. 22 at 6, ¶ 25), published these allegedly false statements in its reports and audits knowing FSC would republish them in its certification database, and thereby "made false and defamatory statements to third parties about the Galleys and their property." *Id.* at 12, ¶ 52. The Galleys further assert that RA "maliciously made the false statements under circumstances evidencing personal ill will, insult, and oppression with a reckless or wanton disregard of the Galleys' rights" and "with actual knowledge of the falsity of the statements made." *Id.* at 14, ¶ 65. The Galleys do not seek damages for a reputational injury, but instead seek them for "financial injury, injury to lands, diminished property value, and loss of business." *Id.* at

14, ¶ 64; *see also* Doc. 57 at 17 ("Here, the Galleys have pled that they suffered 'injury to lands' . . . caused by [RA]'s negligent and defamatory certification of their property.").

Although defamation need not be pleaded with particularity, the Galleys' allegations are arguably insufficient for federal pleading purposes. *See Bloom v. Fox News of Los Angeles*, 528 F. Supp. 2d 69, 74 (E.D.N.Y. 2007) ("[F]ederal courts do require that the alleged defamatory statements be pleaded with sufficient specificity to put the defendants on notice. In assessing whether a defamation claim has been plead with sufficient particularity, courts look to whether said complaint references the alleged defamatory statement, identifies who made the statement, when it was made, the context in which it was made, whether it was made orally or in writing and whether it was made to a third party.") (internal citations and quotation marks omitted); *cf. Solomon v. Atlantis Dev., Inc.*, 516 A.2d 132, 137-38 (Vt. 1986) (construing Vt. R. Civ. P. 8(a) and concluding "[a]lthough the defendant failed to plead the defamatory statements *in haec verba*, he fully informed the plaintiff of the nature and subject matter of the [defamation] counterclaim"). However, because the Galleys allege that the defamatory statements were made in RA's "audits and reports" and because only RA's 2012 Audit has been identified and submitted to the court, the Galleys' defamation claim appears to be confined to the statements set forth therein. Of those statements, only two address AGSA's ownership and the resolution of the Galleys' trespass claim:

> The certified area increased from 10,035.81 hectares to 11,584.90 hectares because AGSA proved possession of 1,547.11 hectares that were in dispute with its neighbors and which AGSA lawfully owns. The change in the certified area is due to the inclusion of planted areas plus roads.
>
> * * *
>
> **Evidence provided by the Organization:** Lower-court decision declaring the LEGAL ACTIONS CLAIMING OWNERSHIP filed by Mr. Galley INADMISSIBLE. Observation of the work in question in the field.

(Doc. 34-3 at 2-3.) Of these statements, the only allegedly false and defamatory statement identified by the Galleys is that "AGSA lawfully owns" the 1,547.11 hectares

comprising the Disputed Parcel.[11]  The Galleys allege that this statement is untrue because "AGSA does not own the property and does not legally possess it" and that "the Galleys are defamed because [RA] is stating that they do not own their land." (Doc. 36 at 23.)

RA seeks dismissal of the defamation claim, arguing that they cannot establish that RA made any false or defamatory statements regarding the Galleys.  RA further asserts that the Galleys have not alleged either a *per se* claim or special damages and have thus failed to allege the essential elements of a defamation claim.

Under Vermont law, "the familiar elements of defamation, which comprises libel and slander," are:

> (1) a false and defamatory statement concerning another; (2) some negligence, or greater fault, in publishing the statement; (3) publication to at least one third person; (4) lack of privilege in the publication; (5) special damages, unless actionable *per se*; and (6) some actual harm so as to warrant compensatory damages.

*Russin v. Wesson*, 2008 VT 22, ¶ 5, 183 Vt. 301, 303, 949 A.2d 1019, 1020 (citing *Lent v. Huntoon*, 470 A.2d 1162, 1168 (Vt. 1983) (footnote omitted)).  "A defamatory statement is one that tends to 'blacken the reputation of the plaintiff and expose her to public hatred, contempt or ridicule.'" *Davis v. Am. Legion, Dep't of Vt.*, 2014 VT 134, ¶ 22, 114 A.3d 99, 106 (quoting *Kinsley v. Herald & Globe Ass'n*, 34 A.2d 99, 101 (Vt. 1943)).

---

[11] The 2012 Audit states that the change in the certified area is not only because of the outcome of the Galleys' trespass claim, but because of AGSA's activities on the Disputed Parcel.  It is not clear whether this refers to RA's determination that AGSA has established adverse possession of the Disputed Parcel.  The remaining statements do not appear to provide a factual basis for the Galleys' defamation claim.  Although the Galleys claim that the outcome of the Trespass Action is mischaracterized, they concede in their First Amended Complaint that the 2010 Order concluded that they "had not met their burden to prove all of the elements of the Trespass Action." (Doc. 22 at 6, ¶ 24.)  They also acknowledge that AGSA "took possession and control of over 1,547.11 hectares of land (approximately 3,823 acres) from the Galley Property[.]" *Id.* at 4, ¶ 18.

17

RA is correct that Vermont law requires that the allegedly false and defamatory statement be "concerning another" and not concerning another's property.[12] *Russin*, 2008 VT 22, ¶ 5; *see also* Restatement (Second) of Torts § 564 ("[a] defamatory communication is made concerning the *person* to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer.") (emphasis supplied). Indeed, "an individual plaintiff must be clearly identifiable [in an allegedly defamatory statement] to support a claim for defamation." *Algarin v. Town of Wallkill*, 421 F.3d 137, 139 (2d Cir. 2005) (internal quotation marks omitted). This requirement is constitutional in nature. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 292 (1964) (holding that where there is no evidence connecting the statements with the respondent, "the evidence was constitutionally insufficient to support a finding that the statements referred to respondent.").

In this case, the allegedly false statement pertains to AGSA and *its* ownership of the Disputed Parcel. Although the statement contains a reference to AGSA prevailing in a dispute with its "neighbors," "[a] defamation claim is insufficient if a statement merely makes reference to the plaintiff as a member of a group[.]" *Abramson v. Pataki*, 278 F.3d 93, 102 (2d Cir. 2002). In any event, the Galleys concede that AGSA *did prevail* in their dispute in the Mexican courts. *See* Doc. 57 at 3 (observing that "minor discrepancies in land definition prevented the Galleys from prevailing in the Mexican court ejectment proceeding"). Accordingly, the gist of the challenged statement is true. *See Weisburgh v. Mahady*, 511 A.2d 304, 306 (Vt. 1986) ("For the defense of truth to apply, 'it is now generally agreed that it is not necessary to prove the literal truth of the accusation in every detail, and that it is sufficient to show that the imputation is substantially true, or, as it is often put, to justify the 'gist,' the 'sting,' or the 'substantial truth' of the defamation.'") (quoting W. Prosser & W. Keeton, The Law of Torts § 116, at 842 (5th ed. 1984) (footnotes omitted)).

---

[12] The Galleys argue that "people are referenced" but concede "it just happens that the defamation relates to property ownership." (Doc. 36 at 23.)

18

Even if the alleged defamatory statement is deemed an implied statement that the Galleys do not own the Disputed Parcel, the Galleys do not allege that this exposed them to "public hatred, contempt or ridicule[,]" *Davis*, 2014 VT 134, ¶ 22, or "harm[ed] the reputation of [the Galleys] as to lower [them] in the estimation of the community or to deter third persons from associating or dealing with [them]." *Weisburgh*, 511 A.2d at 306 (internal quotation marks omitted) (quoting Restatement (Second) of Torts § 559). As a result, even if the Galleys could establish that the statements in the 2012 Audit are false and about them, they could not further establish that they are defamatory.[13]

As for the Galleys' argument that dismissal of their defamation claim would be premature because they have not yet conducted discovery, they do not explain how discovery will alter the content of the statement at issue and render it a *false* and *defamatory* statement about *them*. No amount of discovery is thus likely to supply the missing essential elements of their defamation claim.

Because the Galleys fail to allege a plausible claim of defamation under Vermont law, judgment on the pleadings in RA's favor is appropriate and the Galleys' defamation claim is hereby DISMISSED. *See* Fed. R. Civ. P. 12(b)(6); 12(c).

### D.    Whether the Court Should Dismiss the Galleys' Slander of Title Claim.

The Galleys assert a slander of title claim, alleging that RA "published false statements about the Galleys' title to the [Disputed Parcel]." (Doc. 22 at 13, ¶ 62.) They assert that these false statements adversely affected their use of the Galley Property and "encouraged AGSA to continue its illegal invasion of, and illegal harvesting of wood from, the Galleys' Property" which they claim proximately caused them to suffer "financial injury, injury to lands, diminished property value, and loss of business." *Id.* at 14, ¶¶ 63-64. As with their defamation claim, they assert that RA "maliciously made the

---

[13] "It is the function of the court to determine whether an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion about the plaintiff or his conduct[.]" Restatement (Second) of Torts § 566 cmt. c; *see also Blouin v. Anton*, 431 A.2d 489, 491 (Vt. 1981) (trial court properly ruled statements "did not constitute libelous statements as a matter of law.").

19

false statements under circumstances evidencing personal ill will, insult, and oppression with a reckless or wanton disregard of the Galleys' rights" and "with actual knowledge of the falsity of the statements made." *Id.* at 14, ¶ 65.

Under Vermont law, which follows the Restatement, "[t]he particular form of injurious falsehood that involves disparagement of the property in land, chattels, or intangible things, is commonly called 'slander of title[,]'" a cause of action distinguishable from a defamation claim. Restatement (Second) of Torts § 624 cmt. a. "To prove slander of title, a plaintiff must prove that a defendant falsely published a statement concerning plaintiff's title that caused special damages to the plaintiff and that defendant acted with malice." *Wharton v. Tri-State Drilling & Boring*, 2003 VT 19, ¶ 14, 175 Vt. 494, 497, 824 A.2d 531, 537. "The essence of the tort is the publication of an assertion that is derogatory to the plaintiff's title to property in an effort to prevent others from dealing with the plaintiff." *Id.*

In order to maintain an action for slander of title, the plaintiff must "have a transferrable ownership interest capable of disparagement." *Sullivan v. Stear*, 2011 VT 37, ¶ 11, 189 Vt. 442, 446, 23 A.3d 663, 666; Restatement (Second) of Torts § 624 cmt. c ("Any kind of legally protected interest in land, chattels or intangible things may be disparaged if the interest is transferable and therefore salable or otherwise capable of profitable disposal"). If a plaintiff cannot establish "a transferrable ownership interest capable of disparagement[,]" the defendant is entitled to judgment as a matter of law in its favor. *See Sullivan*, 2011 VT 37, ¶¶ 10-12.

RA contends that any statements it made, even if false, did not "concern" the Galleys' title because the Mexican courts rejected the Galleys' claim to ownership of the Disputed Parcel, a necessary predicate to their slander of title claim. The Galleys counter that the Mexican courts determined that they own the property contained in their deeds and never reached the question of who owns the Disputed Parcel. Both arguments find support in the 2010 Order but merely serve to underscore the conclusion that the Galleys' title to the Disputed Parcel has not yet been established.

Based on the expert evidence presented, the Mexican court ruled that, "it was not possible to locate the areas that are covered by the property titles exhibited by [the Galleys], . . . except for property Tucán 1" and that "[the] property titles displayed by [the Galleys], in their capacity of foundational property titles for the action for recovery of possession, do not correspond to the area of land [they] claim[] the respondent has in his possession." (Doc. 36-17 at 21.)  The Mexican courts rejected the Galleys' claims with regard to the Tucán 1 property because "regarding the property Tucán 1, . . . [i]t can be seen . . . that in no way was the material occupation that is claimed against the neighboring property shown" and '[u]nder these circumstances, we have that in the specific case of Tucán 1, the alleged possession by the company named [AGSA] was not proven, as the second constituent element of the suit for recovery of possession[.]" *Id.* at 22-23.

Although the Galleys point out that the 2010 Order does not foreclose them from establishing ownership of the Disputed Parcel in this lawsuit, they have alleged a claim that requires them to establish title before they can claim it has been slandered.  They therefore ask this court to declare "that the Galleys own title to the [Disputed Parcel] in question and the timber thereon." (Doc. 22 at 11, ¶ 43.)  Vermont law governs how the Galleys may establish ownership of the Disputed Parcel, which, in turn, requires consideration of Vermont's choice of law jurisprudence. *See Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)).

Vermont "has adopted the Restatement (Second) of Conflicts [of Laws] for choice-of-law questions in both tort and contract cases." *McKinnon v. F.H. Morgan & Co.*, 750 A.2d 1026, 1028 (Vt. 2000).  According to the Restatement, "[w]hether a conveyance transfers an interest in land and the nature of the interest transferred are determined by the law that would be applied by the courts of the situs."  Restatement (Second) of Conflict of Laws § 223(1).  Deeds are construed in accordance with the law identified therein for that purpose or, "[i]n the absence of such a designation, the instrument is construed in accordance with the rules of construction that would be applied

21

by the courts of the situs." *Id.* § 224(2). The "courts of the situs" are in Mexico. This court must therefore apply Mexican law to determine whether the Galleys own the Disputed Parcel. RA asks the court to consider the doctrine of international comity in deciding whether to undertake this task.

### E.   Whether the Court Should Decline Jurisdiction as a Matter of International Comity.

RA asks the court to dismiss this entire lawsuit on international comity grounds because it requires the court to second-guess the Mexican courts and their interpretation of Mexican deeds, Mexican law, and acts that have occurred on Mexican real estate. RA argues, in the alternative, that even if this court finds that the Mexican courts did not fully resolve the issue of who owns the Disputed Parcel, in order to adjudicate the Galleys' claims, this court will need to make that determination in accordance with Mexican law. It urges the court to refuse to make this determination on the grounds of international comity and because AGSA and any other claimant to the Disputed Parcel are necessary parties to any title determination and must be provided with notice and an opportunity to be heard.

The Galleys respond that their claims are *in personam*, not *in rem*, and this case has "very little" to do with the decisions of the Mexican courts because those courts never determined ownership to the Disputed Parcel. (Doc. 57 at 3.) They assert that they plan to amend the First Amended Complaint to add Mexican real property which RA allegedly also wrongfully certified and which "was never addressed in any respect by the Mexican court." *Id.*

"[T]he generally recognized principle of international comity [is] that one nation affords recognition 'within its territory to the legislative, executive, or judicial acts of another nation.'" *United States v. Federative Republic of Brazil*, 748 F.3d 86, 91 (2d Cir. 2014) (quoting *Hilton v. Guyot*, 159 U.S. 113, 143 (1895)). Under the strain of international comity known as "comity among courts" or "adjudicatory comity," the court has discretion "to decline to exercise jurisdiction in a case properly adjudicated in a

22

Disputed Parcel and any other lands the Galleys intend to allege RA wrongfully certified are primarily located in Mexico. The Galleys do not explain how this court could readily compel the production of evidence located in Mexico or the testimony of Mexican witnesses, or authorize a survey of the Galleys' lands by Mexican surveyors. The Galleys also do not claim that they cannot bring their slander of title claim in Mexico, or that that claim has any particular relevance to RA's activities in Vermont.[16] Instead, the vast majority of harm they allege took place in Mexico based upon activities that allegedly occurred and continue to occur there.

Although RA has not affirmatively consented to jurisdiction in Mexico, the Galleys allege facts that may support a conclusion that RA may be subject to jurisdiction there. In its 2012 Audit, RA indicates that it has visited the Disputed Parcel and bases it certification on how AGSA is maintaining and improving it in support of its forestry operations. These facts also weigh in favor of deferring to Mexico as the most appropriate forum. *See Jota v. Texaco Inc.*, 157 F.3d 153, 160 (2d Cir. 1998) ("When a court dismisses on the ground of comity, it should normally consider whether an adequate forum exists in the objecting nation and whether the defendant sought to be sued in the United States forum is subject to or has consented to the assertion of jurisdiction against it in the foreign forum.").

Finally, the Galleys assert no plans to join AGSA in this lawsuit. If this court determines title to the Disputed Parcel, AGSA may "claim[] an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect the interest[.]" Fed. R. Civ. P. 19(a)(1)(B); 19(a)(1)(B)(i). Because AGSA's and RA's interests are not "aligned in all respects[,]" it is doubtful that the court could craft its judgment so as "to alleviate any prejudice that may exist to [AGSA]." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 133-34 (2d Cir. 2013), *cert. dismissed*, 135 S.

---

[16] RA's publication of the allegedly defamatory certification took place on FSC's website and thus Vermont's interest in the resolution of this dispute is not demonstrably stronger than any other state's.

25

foreign state[.]"[14]  *Maxwell Commc'n Corp. v. Société Générale*, 93 F.3d 1036, 1047 (2d

Cir. 1996).  The Supreme Court has explained the doctrine's rationale as follows:

> [W]here there has been opportunity for a full and fair trial abroad before a
> court of competent jurisdiction, conducting the trial upon regular
> proceedings, after due citation or voluntary appearance of the defendant,
> and under a system of jurisprudence likely to secure an impartial
> administration of justice between the citizens of its own country and those
> of other countries, and there is nothing to show either prejudice in the court,
> or in the system of laws under which it was sitting, or fraud in procuring the
> judgment, or any other special reason why the comity of this nation should
> not allow it full effect, the merits of the case should not, in an action
> brought in this country upon the judgment, be tried afresh, as on a new trial
> or an appeal, upon the mere assertion of the party that the judgment was
> erroneous in law or in fact.

*Hilton*, 159 U.S. at 158.

The Galleys concede that their claims require them to establish title to real

property located in Mexico.[15]  This determination requires the application of Mexican

property law with regard to which this court has no familiarity or expertise.  These facts,

alone, weigh in favor of finding that international comity requires dismissal.  *See Loya v.*

*Starwood Hotels & Resorts*, 2007 WL 1991163, at *10 (W.D. Wash. July 6, 2007)

("[t]his Court is not familiar with Mexican law.  The need to apply foreign law strong[ly]

favors dismissal"), *aff'd sub nom. Loya v. Starwood Hotels & Resorts Worldwide, Inc.*,

583 F.3d 656 (9th Cir. 2009).  Other facts buttress this conclusion.

The Galleys initiated litigation against AGSA, selecting Mexico as their chosen

forum.  *See Fortuin v. Milhorat*, 683 F. Supp. 1, 4 (D.D.C. 1988) ("[W]hen, as here, an

action features a dispute over real property, the [local] court is not only an 'adequate'

forum, . . . but perhaps a superior forum for the litigation of the parties' rights and

obligations.") (internal citation omitted).  Although they argue that there is wide-spread

---

[14] The other strain of the international comity doctrine is legislative or "prescriptive" comity,
which guides American courts in determining the extraterritorial effect of federal statutes.  *See*
*Maxwell Commc'n Corp. v. Société Générale*, 93 F.3d 1036, 1047 (2d Cir. 1996).

[15] *See* Doc. 54 at 36-37 (**The court**: "In order to decide whether or not your client had been
harmed, wouldn't the finder of fact have to determine that you were the owner of the land?"  **The**
**Galleys' counsel**: "Yes, or superior title to the land.  Yes.").

corruption in Mexican commerce, they make no corresponding claim that the Mexican courts lacked jurisdiction, were corrupt, or rendered a fraudulent judgment. This is therefore not a case in which a party was forced into an undesirable and inadequate forum which produced an unjust result. Rather, it is one in which the party's chosen forum produced a disappointing result which the party now seeks to re-litigate for purposes of different claims. While this may be permissible, it will require the court to re-examine much of the evidence presented in the Mexican courts and come to its own determination of whether the Galleys have established title to the Disputed Parcel. The doctrine of international comity does not favor that outcome. *See Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V.*, 809 F.3d 737, 743 (2d Cir. 2016) (holding international comity prohibited district court from determining whether foreign sovereign had violated foreign law in assignment of certain property rights and observing that "[e]ven an inquiry into whether Russian law permitted the [a]ssignment is a breach of comity.").

The Galleys represent that "the fight is far from over in Mexico[,]" they "have a complaint on file with the Supreme Court of Mexico[,]" and they "continue to make complaints, and investigations have been opened into the local corruption issues that the Galleys believe have impacted their property rights." (Doc. 36 at 12.) These representations merely emphasize why their claims should proceed in Mexico rather than on dual tracks in both countries, rendering this court's determination of title either duplicative or potentially inconsistent with a judicial determination of that same issue in Mexico. *See Duff & Phelps, LLC v. Vitro S.A.B. de C.V.*, 18 F. Supp. 3d 375, 388 (S.D.N.Y. 2014) ("It would be unfortunate, and a waste of the parties' time and money, if—after potentially extensive and expensive discovery proceedings had commenced— conclusive evidence were to come to light that, in fact, the Mexican District Court had intended all along to extinguish [the party's] right to pursue such a [claim]").

In addition to duplicative or inconsistent outcomes, there is a strong likelihood that the Galleys' slander of title claim could proceed more efficiently in Mexico than it could in the District of Vermont. The facts, evidence, and witnesses relevant to title to the

24

Ct. 42 (2014). Were the court to declare that the Galleys own title to the Disputed Parcel, it would therefore inevitably prejudice AGSA in the absence of its joinder in this lawsuit. *See Davidson Well Drilling, Ltd. v. Bristol-Myers Squibb Co.*, 2009 WL 2135396, at *4 (S.D.N.Y. July 16, 2009) ("Adjudication of a case in the absence of a party is prejudicial when it is difficult to imagine how the issue . . . would be resolved without its participation in the litigation.") (internal quotation marks omitted). There is no evidence that AGSA is subject to this court's personal jurisdiction.

For a claim with a minimal relationship to Vermont, and which is wholly dependent on the resolution of title to Mexican real property under Mexican law, RA has sustained its burden to establish that the interests of international comity support the refusal to "exercise jurisdiction in a case properly adjudicated in a foreign state[.]" *Maxwell Commc'n Corp.*, 93 F.3d at 1047.

For the foregoing reasons, RA's motion to dismiss the Galleys' remaining slander of title claim based on international comity is GRANTED.

### CONCLUSION

For the reasons stated above, Defendant's Rule 12(c) Motion for Judgment on the Pleadings with Respect to Plaintiffs' Amended Complaint (Doc. 34) is GRANTED. SO ORDERED.

Dated at Burlington, in the District of Vermont, this 11th day of February, 2016.

Christina Reiss, Chief Judge
United States District Court